TAYLOR and another, Appellants, vs. DALL LEAD AND ZINC COMPANY, Respondent.

*March 23—April 9, 1907.*

*Liens: Subcontractors: Agency of principal contractor for owner: Waiver: Estoppel: Notice of claim: Time limited: Successive deliveries of materials: Unity of transaction.*

1. Within the scope of a building contract the principal contractor is the agent of the owner to subject his property to liens in favor of subcontractors for labor and materials; and a subcontractor who furnishes to the principal contractor materials which are wrought into the building in compliance with the specifications of the contract is entitled to a lien notwithstanding a failure of the principal contractor to complete the building in exact compliance with the contract and without regard to whether the principal contractor may be debarred of a lien by reason of the fact that nothing is owing him upon his contract.

2. When a payment was about to be made to the principal contractor in accordance with the contract, subcontractors asked the owners to pay the money to them on their bill for materials, but failed to obtain a written order from the principal contractor as suggested by the owner, and took no legal proceedings to intercept the payment to the principal contractor. They had no contract right to intercept it. *Held*, that these facts did not show any waiver of the subcontractors' rights, any estoppel, or any extension of time of payment to the principal contractor.

3. Sec. 3315, Stats. (1898), requiring a subcontractor furnishing materials to give notice of his claim of lien within sixty days after such materials are furnished, does not require a separate notice for each delivery where all were so connected as to constitute substantially one transaction, and in such a case the furnishing is not deemed complete until the last delivery.

4. Where the principal contractor for a building orders and receives from a subcontractor material therefor from time to time as the construction progresses, it will be presumed that such purchases have relation to each other and constitute but one transaction for the purposes of the lien statute, although there may be no express agreement in advance that the principal contractor will purchase, or the materialman furnish, all that may be called for in such construction; but where the continuity of such deliveries is broken by long and unusual periods of time, a presumption against the unity of the transaction arises, un-

less such interruption and severance in time be clearly explained.

5. Subcontractors agreed to furnish for the construction of a mill a large quantity of lumber according to a list submitted by the principal contractor, and there was a tacit understanding that they would be called upon to furnish such other lumber as might, in accordance with usual experience, be needed in addition to that specified in the list. They furnished additional lumber in pursuance of such understanding, the deliveries being closely connected in time and the lumber being wrought into the mill in the course of the continuous and uninterrupted construction. *Held*, that there was but a single furnishing of materials and that notice of the subcontractors' claim for a lien might be given at any time within sixty days after the last delivery.

APPEAL from a judgment of the circuit court for La Fayette county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Action to foreclose subcontractors' lien. The defendant, a mine owner, entered into a written contract with the Platteville Foundry & Machine Company to build for the former a concentrating plant, furnishing all materials, according to plans and specifications attached to the contract, for the sum of $13,500. The specifications covered the mill, engine house, and connected building in which, by the specifications, there were to be placed certain patented tables which, it was expected, would economically serve a purpose of separating certain inconsistent portions of the ore. The contractor was in the line of business of manufacturing such plants and had had experience with such tables. Included in the proposal and specifications adopted by the contract was an express guaranty by the contractor that the mill should have a certain capacity and that the separation of the ore should be accomplished up to a specified degree of completeness. The contractor built the mill complete and exactly in accordance with the specifications, but, by reason of peculiarities in defendant's ores, the patented tables were found ineffective, so that the ore could not be separated upon them in accordance with the guaranty. That could only be done by the substitution

of roaster appliances in connection with the same buildings, which was afterwards done by the defendant at an expense of about $7,000. Pending the doing of the work defendant had made two twenty-five per cent. payments to the principal contractor in accordance with the terms of the contract, aggregating $6,750, all parties being then ignorant of the inefficiency of the patented tables.

Plaintiffs, lumber dealers at Platteville, at about the time of the commencement of the work, were asked to figure upon a list of lumber supposed to be all that was necessary for the construction of the entire plant, and made a price thereon of $2,335, which was accepted. Such lumber was delivered from time to time between the date of the contract and about August 19, 1904. After such bid several additional small quantities of lumber were ordered and delivered by plaintiff and used in the construction of the mill as originally designed, bringing the total up to $2,525.95, the last instalment of such subsequent orders being delivered September 23, 1904. Plaintiffs' notice that they claimed a subcontractors' lien was served November 19, 1904.

After the discovery that the tables would not separate the ore as guaranteed, the principal contractor became bankrupt, and, by some arrangement between the defendant and the receiver, the former took possession of the premises, apparently upon mutual abandonment of all claim by one against the other; the defendant making no claim for damages by reason of the breach of the guaranty nor for return of any of the moneys paid, and no claim having been thereafter urged against the defendant in favor of the principal contractor's estate.

The defendant denying plaintiffs' subcontractors' lien, this action was brought and tried, and, after disclosure of substantially the foregoing facts, with perhaps some others to be mentioned in the opinion, the court denied plaintiffs' right to lien on several grounds, and entered judgment dismissing the complaint, from which plaintiffs appeal

For the appellants there was a brief by *Burns & Ellis,* and oral argument by *E. E. Burns.*

*W. H. Beebe,* for the respondent.

DODGE, J.  The trial court, as indicated by an opinion filed, found three reasons why the plaintiffs could not maintain a lien against the defendant's property, although the lumber had been furnished by them as subcontractors of a principal contractor and in exact accordance with the principal contract.  Of these reasons in their order:

1.  The trial court, in substance, held that, because the principal contractor did not complete its contract by the construction of buildings and appliances satisfying its guaranty of efficiency, it could itself have maintained no lien; certainly not for any amount in excess of that which had been paid it, which was all that was payable by the terms of the contract until the efficacy of the plant could be tested; and that, since no lien could be maintained by the principal contractor at the time plaintiffs commenced their action, they could have none.  Our statute on the subject of subcontractors' liens, sec. 3315, Stats. (1898), provides substantially as follows: Every person who, as subcontractor of a principal contractor, furnishes any materials to such principal contractor for or in or about the erection, construction, etc., of any building or appurtenances thereto, may have the lien and remedy given by this chapter.  Now, it is undisputed that the plaintiffs did exactly those things.  They did, as subcontractors, furnish material to the principal contractor for the erection of a building and appurtenances, and such materials were wrought into a building and appurtenances now standing on the defendant's land.

The query at once becomes pertinent why any court can ignore the behest of the statute that the plaintiffs have a lien.  Prior to 1889 the statute itself gave one reason whenever the enforcement of a lien would compel the owner to pay more than his original contract required; but that obstacle is now removed.  The trial court advances as a reason the fact that

the principal contractor could not itself have maintained a
lien; but the statute makes no such exception.   That such fact
is not universally an obstacle to the subcontractor's right is,.
of course, clear, for the principal contractor could maintain
no action for a lien if it had been paid all that it was entitled
to, whether such payment were the full contract price or were
some less sum to which the principal contractor's right might
be reduced because of some right of deduction, setoff, or
counterclaim existing in the owner's favor.   The trial court
seems to have found authority for an exception to the gen-
erality of the language of the statute in *Goodman v. Baer-
locher,* 88 Wis. 287, 60 N. W. 415, where it was apparently
held that no lien against the land could exist for materials
furnished for the erection of a building, unless that building
was in fact so completed as to come into physical existence.
Whether even this doctrine could be extended, as in the pres-
ent case, to deny the lien where the building came into exact
and complete existence according to its specifications, but
merely failed to satisfy an ancillary guaranty of complete ef-
fectiveness for a given purpose, may well be questioned, for
the latter situation would go only to the liability of the owner
to pay anything, or anything more than he had paid, which
would seem to be deprived of any efficacy to defeat subcon-
tractors' liens by the amendment to our lien statutes already
mentioned, brought in by ch. 333, Laws of 1889.   The princi-
ple rested on in the *Baerlocher Case,* which may be called the
Pennsylvania doctrine, even if applicable to the present situ-
ation, was simply that, no building coming into physical ex-
istence, there never had been any physical substance upon
which the mechanic's lien could fasten.   This doctrine was,
however, carefully considered by this court in *Halsey v. Wau-
kesha Springs S. Co.* 125 Wis. 311, 104 N. W. 94, and en-
tirely repudiated as inconsistent with both the language and
the policy of our own statutes, which give a lien on the land
upon the furnishing of the materials, provided the work of

erection of the structure is in fact commenced; such view having the support of *Rees v. Ludington,* 13 Wis. 276; *Jessup v. Stone,* 13 Wis. 466; and *Fitzgerald v. Walsh,* 107 Wis. 92, 82 N. W. 717. We are informed by counsel that the *Waukesha Case* was not called to the attention of the trial court. Had it been, we cannot think he would have based any conclusion upon the doctrine that the mere failure of the principal contractor to complete the contracted building in exact compliance with the terms of the contract was an insuperable obstacle to the existence of a subcontractor's lien.

Another ground of escape from the direct words of the statute conferring the lien, as stated by the trial court and urged by the respondent, is a rule declared or suggested in several cases, that 'the right of the subcontractor is referable to the original contract, and that what would not be "lienable" in favor of the principal contractor under his contract is not lienable in favor of a subcontractor. This rule is in apparent derogation of the express words of the statute and therefore is to be very cautiously applied. In *Goodman v. Baerlocher, supra,* it was said, *arguendo:*

"If the case is such that the principal contractor is not entitled to a lien for any other reason than that he has been paid in full, as in case of abandonment of his contract or of destruction of the building before completion, the subcontractors under him, and their materialmen and laborers, would not seem to be entitled to any lien."

This language has already been criticised, if not repudiated, in *Seeman v. Biemann,* 108 Wis. 365, 84 N. W. 490, and properly so, for the statute does not limit the right of the subcontractor to cases where the principal contractor could have a lien, and did not do so even when it contained the express limitation protecting the owner against payment of more than the contract price.

The two most important cases in which has been declared the dependency of the subcontractor's lien upon the original

contract are *Siebrecht v. Hogan*, 99 Wis. 437, 75 N. W. 71,
and *Seeman v. Biemann*, 108 Wis. 365, 84 N. W. 490, and
they well illustrate the scope of that rule. In the first of
these a lien was denied to a subcontractor for damages and
additional expense caused by wrongful acts of the principal
contractor and not called for by the contract. · There the court,
construing the words of the statute, said:

"Manifestly, such right of lien is confined to work, labor,
and material required by the principal contract. To that ex-
tent, by force of the statute, the owner makes the principal
contractor his agent to bind his property, but no further. . . .
The whole theory of it is that the owner consents to what is
required to carry out the principal contract, and makes his
property liable therefor in accordance with the statute, which
is made a part of the contract."

The logic of this case is that labor or materials expended
by a subcontractor by reason of the wrongful acts of the prin-
cipal contractor, not within his original contract, are not per-
formed by the plaintiff "as a subcontractor," for he cannot be
a subcontractor where there is no principal contract contem-
plating such service; hence he would not fall within the words
of the statute conferring a lien merely for work done "as a
subcontractor."'

In *Seaman v. Biemann* the holding was that a subcontractor
can have no lien for work or materials where the principal
contract expressly provides that no liens shall be demanded.
This is upon the principle, of course, that the subcontractor,
by becoming such under the principal contract, agrees to abide
by such terms, and therefore by express agreement waives his
lien. It is reiterated in that case that his right against the
property depends upon the agency of the principal contractor
created by that contract to bind the property of the owner,
and that a stipulation therein against the claiming of liens for
any work or materials is an express limitation upon that
agency, to which the subcontractor assents by acting there-
under. In that case it was expressly declared:

"Of course, where a claim is not lienable in favor of the principal contractor, it is not lienable in favor of the subcontractor; but, the lienability of a claim being established, a subcontractor's right to enforce it is not dependent upon whether the owner of the building might defeat it if the claim were made by the principal contractor."

In both of these cases we find aptly defined the true relation under our statutes between the subcontractor and the owner of the land in the declaration that within the scope of the contract the principal contractor is created the agent of the owner to subject his property to a lien in favor of the subcontractor for labor or materials. Applying that rule here, there can be, of course, no hesitation in holding that every foot of lumber, supplied by the plaintiffs upon the order of the principal contractor and used by it in constructing the buildings and their appurtenances in exact compliance with the specifications of the principal contract, was within the scope of the agency created by that document, and that the plaintiffs' right to lien therefor cannot be affected by any consideration whether the principal contractor might be debarred of a lien by reason of the fact that nothing was owing it upon its principal contract.

2. Another ground which the trial court seems to have considered sufficient to deny plaintiffs their lien, and which respondent now urges, is somewhat indefinitely described as waiver, estoppel, or extension of time to the principal contractor. This is wholly predicated upon the fact that, when a certain payment of $1,375 was about to be made in accordance with the contract, the plaintiffs' agent asked the owner that it be paid to them upon the lumber bill, to which the owner responded that he could accede only upon a written order from the principal contractor. This the principal contractor refused to give, and plaintiffs' agent so reported to the owner. The acts of the plaintiffs' agent are thus described by the trial court in its opinion:

"Mr. Martin did not obtain such order, desisting from pressing the foundry company for it upon representations

made to him by the latter, deciding to wait until the next payment was due. He so informed the president of the mining company before the company made said second payment."

We can find in this nothing to indicate waiver, or to arouse an estoppel, or to show any extension of time of payment to the principal contractor. The plaintiffs, at most, refrained from taking legal proceedings to intercept the payment of this money by defendant to the principal contractor. They had no contract right to intercept it, and therefore could neither effectively object nor consent to its payment. They had done all they could to enable the defendant to protect itself, for they had given notice that the lumber bill had not been paid and that they wished the money to be paid to them.

3. The most serious difficulty we have had is upon the decision of the trial court that about $190 worth of lumber ordered from time to time without any specific agreement was upon independent and separate contract from the principal item in the account, which was delivered in pursuance of an accepted bid made about June 13th, and therefore that the lumber included in the original bill was not furnished within sixty days of the service of the notice for claim of subcontractors' lien. This involves so much of a question of fact that, if there be any fair dispute in the evidence, we should probably feel concluded thereby. The statute, of course, requires that a subcontractor furnishing materials, in order to have a lien therefor, must give the notice within sixty days after such material is furnished. This, however, has always been construed as not requiring a separate notice for each service or delivery where all were so connected as to constitute substantially one transaction. In such case the furnishing has been considered as continuing throughout the whole period, so that it is not completed until the last delivery. Phillips, Mech. Liens (3d ed.) § 229; Jones, Liens (2d ed.) § 1435; *Spruhen v. Stout,* 52 Wis. 517, 9 N. W. 277; *Dorestan v. Krieg,* 66 Wis. 504, 29 N. W. 576; *Wis. P. M. Co. v. Grams,* 72 Wis. 275, 39 N. W.

531; *Williams v. Lane,* 87 Wis. 152, 58 N. W. 77; *Skyrme v. O. M. & M. Co.* 8 Nev. 219; *Helena S. H. & S. Co. v. Wells,* 16 Mont. 65, 40 Pac. 78; *Nye & S. Co. v. Berger,* 52 Neb. 758, 73 N. W. 274; *Frankoviz v. Smith,* 34 Minn. 403, 26 N. W. 227. That thus is opened the door for attempts at abuse is apparent, and many such attempts appear in the books, where one who has fully completed the service or the furnishing of materials that was in original contemplation, and has neglected to claim his lien therefor, has later, upon the rendition or delivery of some service or material in some degree connected with the same enterprise or property, attempted thereby to revive his right to a lien for the former. Such attempts were met and defeated in *E. M. Fish Co. v. Young,* 127 Wis. 149, 103 N. W. 795; *Brown & H. Co. v. Trane,* 98 Wis. 1, 73 N. W. 561; *Brown v. Edward P. Allis Co.* 98 Wis. 120, 73 N. W. 656; *Berry v. Turner,* 45 Wis. 105.

We think it may safely be stated, as the result of experience and authority, that where one having in hand a general undertaking, such as the erection of a building, orders and receives material to be worked into that building from time to time as construction progresses, there is generally an understanding that such purchases have relation to each other, and constitute but one transaction for the purposes of the lien statute, although there may be no express contract or agreement in advance that the owner or principal contractor will purchase, or the materialmen will furnish, all that may be called for in such construction; and that it is the custom of materialmen to keep a running account of the several deliveries as such a single transaction. Many of the above authorities sustain this view and the conclusion that a presumption to that effect is to be indulged by courts. Where, however, the continuity of such deliveries is broken by long and unusual periods of time, a presumption against the unity of the transaction doubtless arises, unless such interruption and severance in time be

clearly explained. In some cases of even such interruption, however, the courts have sustained the unity of the transaction upon the ground that the last items of service or material were expressly required by a general contract under which the whole was performed. Striking illustrations are *Fowler v. Bailley,* 14 Wis. 125, 130, and *Hutchins v. Bautch,* 123 Wis. 394, 101 N. W. 671. That the existence of such unity of contract is not essential, however, to the unity of the transaction when the latter appears from the continuity of the services, their application to a single enterprise, and the attitude of the parties toward it, is decided in many cases. *Chapman. v. Wadleigh,* 33 Wis. 267; *Spruhen v. Stout,* 52 Wis. 517, 9 N. W. 277; *Kerrick v. Ruggles,* 78 Wis. 274, 277, 47 N. W. 437; *Miller v. Batchelder,* 117 Mass. 179; *Frankoviz v. Smith,* 34 Minn. 403, 26 N. W. 227; *State S. & D. Mfg. Co. v. Norwegian-Danish Sem.* 45 Minn. 254, 47 N. W. 796; *St. Paul & M. P. B. Co. v. Stout,* 45 Minn. 327, 47 N. W. 974; *Jones & M. L. Co. v. Murphy,* 64 Iowa, 165, 19 N. W. 898; *Rush v. Able,* 90 Pa. St. 153; *Skyrme v. O. M. & M. Co.* 8 Nev. 219; *Albright v. Smith,* 2 S. Dak. 577, 51 N. W. 590.

In the light of these rules and the distinctions illustrated by the several decisions, let us examine the evidence in this case, in which there is really very little conflict. The principal contractor, having taken the contract to build this mill and its appurtenances, submitted to the plaintiffs a long list of various sizes and dimensions of lumber to be supplied for that work. The agent conducting the business testifies that it was intended to include all the lumber necessary for the buildings, but that, almost uniformly, such attempts to specify in advance are only approximately correct, and that in almost all cases it is found that some things have been omitted. Hence, of course, both parties, being experienced in their business, dealt with such probability in mind. Plaintiffs' agent testifies to the understanding that if their price on this original estimate was accepted they would be expected to furnish such

lumber as was wanted for the whole building contract. This was somewhat ambiguously denied by the representative of the principal contractor, who testified merely that it was not his understanding of the agreement "that the plaintiffs were to furnish all our lumber and building supplies as needed as the work progressed." This, however, is explained by his further statement that he did not intend to buy of them all the building material, and illustrates that the principal contractor furnished its own galvanized roofing, cement, and other building material. Again, on cross-examination, in response to the direct question, he says, "No, I would not say that that was the understanding; but I would not dispute that we have—we might have." After the plaintiffs' bid was made they commenced delivering the lumber specified in the original invoice, which they mainly ordered specially and had shipped in cars direct to the Dall mine. These carload shipments continued until nearly the 1st of August, and some omitted items of the original invoice were delivered from time to time thereafter up to about August 19th. Meanwhile, as early as August 5th, the principal contractor, discovering certain other lumber not included in these specifications to be needed, apparently as a matter of course ordered the same from the plaintiffs; and so, from time to time, thereafter, at short intervals, namely, August 5th, 15th, and 19th, and September 10th, 14th, 19th, and 23d; to which orders the plaintiffs, equally as matter of course and without question, responded by delivering all said articles and charging them upon the same account which they had opened with the principal contractor under heading, "For Dall Mine." The first bill rendered by plaintiffs to the principal contractor was September 7th, and included, first, the contract price of the original invoice, $2,335, and also the several other items which had been delivered up to that time. That bill was received, checked up, and certain trifling corrections made, with no comment indicating surprise at the joining of these various items in one account and in one bill.

Against this state of facts and testimony is the evidence of

the representative of the principal contractor: "This bill of lumber [the original] purchased of Taylor Bros. was a distinct and independent transaction. Our subsequent purchases were all extras over and above that contract." This he explained upon cross-examination by declaring: "Each order I gave for that mill was independent of every other order in the same sense that the first was independent of the rest." This seems to make it quite clear that the testimony of this witness as to the independence of the several orders was, as of course it must have been, his own conclusion, and based upon his own conception of what constituted independence and severance; and it also indicates that his conception of that distinction was very different from that which the courts recognize, for they, with almost complete unanimity, treat a series of successive orders for material for a single undertaking, thus closely connected in time, as not independent in the sense that they did not together constitute a single furnishing of materials.

After careful examination and consideration of all this evidence we are forced to the conclusion that, practically without dispute, it establishes both an understanding, tacit perhaps, that plaintiffs were to be called on and would respond to furnish such other lumber as might, in accordance with usual experience, have been omitted from the specifications upon which they originally bid, and that both parties fully understood that all the subsequent deliveries were in pursuance of such original understanding. It is too plain for controversy that they were all so closely connected in time, and so in response to the continuous and uninterrupted construction of the building, that no doubt is cast upon the entire good faith of both parties so as to bring the situation within the condemnation of some of the cases above cited. We have no doubt that the ordinary dealer in building materials would consider, under similar circumstances, that he had not completed the furnishing of materials for the construction of this mill so

long as the principal contractor was continuing with construction and needing and ordering materials in so doing. Any rule of law which would declare a severance and render necessary repeated notices, and perhaps repeated suits, as each such delivery was made, would do violence to 'the common understanding of people engaged in such transactions, would accomplish no good purpose in the way of protecting reasonably diligent owners, and would only serve as a trap to defeat materialmen and laborers who have merely postponed efforts of enforced collection to the final completion of their undertakings in good-faith expectation that payment would then be provided. Such is not the policy of our lien statutes, whose spirit, we are well convinced, will be best effected by holding that the transactions here disclosed constituted but a single furnishing of materials for this single enterprise of constructing this building. So holding, of course the conclusion is irresistible that plaintiffs are entitled to judgment establishing their lien as claimed.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in accordance with the prayer of the complaint.

CASSODAY, C. J., took no part.